# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, ) | No. 73798-8-I |
| ) | |
| Respondent, ) | |
| ) | DIVISION ONE |
| v. ) | |
| ) | |
| MARGARET COLSON, ) | UNPUBLISHED OPINION |
| ) | |
| Appellant. ) | FILED: <u>March 27, 2017</u> |

SPEARMAN, J. — Margaret Colson participated in an identity theft ring in which she and her associates stole from residential mailboxes, then used information found in the mail for financial gain. Colson was convicted of nine counts of identity theft and one count of possession of stolen mail. The jury also found, as an aggravating factor, that some counts were major economic offenses. On appeal, she argues the evidence is insufficient to support her convictions, that the jury was improperly instructed on accomplice liability and that the State failed to prove the aggravating factor. Finding no error, we affirm.

## FACTS

In December 2011, Shawn Schulze and his boyfriend, Vikram Chopra, were living with Margaret Colson in the home she shared with her husband. Colson had only recently met them through a methamphetamine dealer. They

moved in with her because they had become homeless. Both Chopra and Schulze regularly used heroin and methamphetamine. Prior to moving in with Colson, Schulze and Chopra sometimes sold stolen items for cash. After moving in with Colson, the three began stealing mail. They drove Colson's car to wealthy neighborhoods and stole mail from mailboxes. Id. They also used identifying information found in the mail to steal merchandise from retail stores.

A method they repeatedly used involved Nordstrom. Using Nordstrom account numbers discovered in stolen mail, they purchased items by phone, picked up the items in person, and then returned them for a cash refund. At trial, the State presented evidence from Nordstrom that correlated the purchase and return of an item with surveillance photos and video recording of the transactions. Colson was always involved in either the phone order, pick-up, or cash refund. The three shared the proceeds of each transaction, with Colson receiving slightly more because Chopra and Schulze were staying with her.

On February 16, 2012, Schulze was driving Colson's car in a Kirkland neighborhood, with Colson in the passenger seat. A resident observed Schulze get out of the car and check for mail in a group of mailboxes on a cul-de-sac. Schulze found a piece of mail and removed it. Colson rolled down the window and checked other mailboxes. When the car came back around the cul-de-sac, it sped past the resident who was attempting to flag it down. The resident called police, who stopped the car on the freeway. Colson and Schulze were arrested, the car was impounded and the officers obtained a warrant to search the car.

2

During the search, the officers discovered mail underneath the car seats, between the seats and the center console, in the glove compartment and trunk. Also under the front passenger seat was a small metal box containing debit cards, credit cards, and checks in the names of people other than Colson and Schulze. Id. at 80-81. One of the debit cards belonged to Brett Stanewich and there was a check in Stanewich's name that was written to Joe Eskridge. Another check was in the name of Rafic Farah and Genevieve Attie, and was also written to Joe Eskridge. These checks had been deposited into an Ally Bank account that was opened by Chopra in the name of Joe Eskridge. Colson and Schulze used a debit card for this account to withdraw cash and make purchases.

Colson was charged with nine counts of identity theft and one count of possession of stolen mail. The jury convicted Colson of all ten counts, and found that counts 5 through 10 (all relating to the Nordstrom scheme) were "major economic offenses" that could support an exceptional sentence beyond the standard range. Colson received concurrent sentences of 50 months for the eight counts of second degree identity theft, 12 months for count 4 (possession of stolen mail), and 36.75 month prison-based the Drug Offender Sentencing Alternative (DOSA) sentence for count 7 (first degree identity theft), which were all within the standard range. CP at 205; 207. Colson appeals.

DISCUSSION

Sufficiency of the Evidence

Colson challenges the sufficiency of the evidence to prove that counts 1 and 2 of identity theft were committed "on or about February 16, 2012." Clerk

3

Papers (CP) at 114-15. She contends that the State's evidence showed that she actually committed those counts in early February.

The State must prove all elements of a charged crime beyond a reasonable doubt. State v. Larson, 184 Wn.2d 843, 854, 365 P.3d 740 (2015). When a criminal defendant challenges the sufficiency of the evidence against him, we determine whether, viewing the evidence in the light most favorable to the State, "any rational trier of fact could have found guilt beyond a reasonable doubt." State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992) (citing State v. Green, 94 Wn.2d 216,220-22, 616 P.2d 628 (1980)). We accept as true all the State's evidence and any inferences that the jury could reasonably have drawn from it. Id. at 201.

The jury was instructed that to convict Colson of counts 1 and 2 of second degree identity theft, they must find "[t]hat on or about February 16, 2012, the defendant knowingly obtained, possessed, transferred, or used a means of identification or financial information of another person, living or dead, [knowing] that the means of identification or financial information belonged to another person. . . ." CP at 114-15. Contrary to Colson's argument, listing a date in the jury instructions does not convert it to an element which the State must prove with precision. "[O]n or about" jury instructions do not require proof that the crime occurred on a precise date so long as the instructions do not mislead the jury into rejecting an otherwise valid defense. State v. Danley, 9 Wn. App. 354, 357, 513 P.2d 96 (1973) (evidence that the crime occurred within a week of the date in the

4

"on or about" instruction was sufficient). Colson does not argue that the jury instructions prevented her from presenting evidence of an alibi or other defense.

The State presented evidence that on February 16, 2012, Colson possessed the stolen financial information of Brett Stanewich and Rafic Farah, the victims in counts 1 and 2 for identity theft. In Colson's car, police found a debit card belonging to Stanewich and a check dated February 5, 2012 from Stanewich to Joe Eskridge, deposited in Ally Bank. Police also found a check from Farah to Joe Eskridge dated February 4, 2012, and deposited in Ally Bank. The evidence of identity theft in counts 1 and 2 is sufficient to prove that they occurred "on or about" February 16, 2012.

Colson additionally argues that there is insufficient evidence to sustain count 2 because the State did not prove that the victim was a real person. To commit identity theft, the identifying information must belong to a specific, real person. State v. Berry, 129 Wn. App. 59, 62, 117 P.3d 1162 (2005). In Berry, the defendant attempted to use a check listing a real bank account, but a fake name. He was charged with identity theft of the fictitious name. The court held that an identity theft victim must be a real person. Id. at 62. Colson argues that because victim Rafic Farah did not appear at trial, there is insufficient evidence that he is a real person. Unlike in Berry, there is no evidence that Farah is fictitious. Colson, Chopra, and Schulze stole Farah's checks in the mail and successfully made a deposit. This evidence supports an inference that he is a real person.

Accomplice Liability Instructions

Colson contends that the State had the burden to prove that she acted as a principal for each charge, and that they failed to meet that burden. Colson reasons that even though there was a general accomplice liability jury instruction, the inclusion of accomplice liability in the to-convict instruction in count 7 nullified that instruction as to the remaining counts. She argues that as a result, the State was required to prove principal liability on all other counts.

An instruction on accomplice liability may be included in the "to convict" jury instruction for each charge, or in a separate, stand-alone instruction. State v. Teal, 117 Wn. App. 831, 838, 73 P.3d 402 (2003). If there is no accomplice liability instruction, the State must prove that the defendant's own conduct meets the elements of the crime. State v. Willis, 153 Wn.2d 366, 371, 103 P.3d 1213 (2005).

Here, the court instructed the jury on accomplice liability in instruction 29:

> A person is guilty of a crime if it is committed by the conduct of another person for which he or she is legally accountable. A person is legally accountable for the conduct of another person when he or she is an accomplice of such other person in the commission of the crime.

CP at 134. In addition, the to-convict instruction for count 7 included accomplice liability in one element: "That the defendant or an accomplice obtained credit or money or goods or services or anything else in excess of $1500 in value. . . ." CP at 120. Contrary to Colson's argument, the stand-alone accomplice instruction is adequate to instruct the jury. Teal, 117 Wn. App. at 838. We presume that the jury followed all instructions, including the general accomplice liability instruction.

Tennant v. Roys, 44 Wn. App. 305, 315-16, 722 P.2d 848 (1986) (citing In re Municipality of Metro. Seattle v. Kenmore Properties, Inc., 67 Wn.2d 923, 930-31, 410 P.2d 790 (1966)). Colson cites no authority for her argument that the accomplice liability instruction in count 7 somehow nullifies the general accomplice liability instruction and we do not find the argument persuasive. Under the instructions given, Colson could be found guilty as either principal or accomplice on all counts.

Possession of Stolen Mail

Colson argues that the State must prove that Colson received, retained, possessed, concealed, and disposed of stolen mail because each term is included in the to-convict jury instructions. She contends that the State failed to prove that she disposed of stolen mail. The State does not dispute that its proof failed in that regard. Instead it argues that it is not required to prove each means listed in the jury instructions because they are merely definitional.

The State charged Colson with possession of stolen mail under RCW 9A.56.380, accusing her of possessing more than ten separate pieces of stolen mail that were addressed to twelve different addresses. The jury was instructed that to convict Colson, the State must prove:

> (1) That on or about February 16, 2012, the defendant knowingly received, retained, possessed, concealed, or disposed of ten or more pieces of stolen mail addressed to three or more different addresses; (Emphasis added.)
> (2) That the defendant acted with knowledge that the mail had been stolen;
> (3) That the defendant withheld or appropriated the mail to the use of someone other than the true owners or the persons to whom the mail was addressed; and
> (4) That any of these acts occurred in the State of Washington.

CP at 117. According to Colson, this instruction identifies five alternative means to commit possession of stolen mail.

"[T]he alternative means doctrine does not apply to mere definitional instructions; a statutory definition does not create a 'means within a means.'" State v. Owens, 180 Wn.2d 90, 96, 323 P.3d 1030 (2014) (quoting State v. Smith, 159 Wn.2d 778, 787, 154 P.3d 873 (2007)). Washington courts have not examined whether possession of stolen mail is an alternative means or single-means crime. In crimes of possession, however, definitional statutes do not expand the number of alternative means for a given offense. E.g., State v. Hayes, 164 Wn. App. 459, 262 P.3d 538 (2011), aff'd 182 Wn.2d 556, 342 P.3d 1144 (2015) abrogation on other grounds recognized by State v. Tyler, 195 Wn. App. 385, 382 P.3d 699 (2016) (in conviction for possession of stolen property, reference to "receive, retain, possess, conceal, or dispose of stolen property" is definitional and does not create alternative means of committing the crime); State v. Makekau, 194 Wn. App. 407, 409, 378 P.3d 577 (2016) (in conviction for possession of a stolen vehicle, the terms "receive, retain, possess, conceal, or dispose of" are definitional and do not create alternative means); Tyler, 195 Wn. App at 401 (possession of a stolen vehicle is single means crime). Consistent with these authorities, "received, retained, possessed, concealed, or disposed" are definitional and do not create alternative means of committing possession of

8

stolen mail.[1]

Relying on State v. Hickman, 135 Wn.2d 97, 954 P.2d 900 (1998), Colson also contends that under the law of the case doctrine, the State must prove each of the five methods of possession because each is included in the to-convict instruction. But we recently rejected this argument in Tyler, concluding that Hickman is no longer controlling on this issue in light of the United States Supreme Court decision in Musacchio v. United States, ___ U.S. ___, 136 S. Ct. 709, 193 L. Ed. 2d 639 (2016).

In Musacchio, the court examined what process is due, under the Fourteenth Amendment, to a defendant who challenges the sufficiency of the evidence supporting his or her conviction. It rejected the idea that the law of the case doctrine has any relevance at all to this analysis. Id. at 716. Instead, the court held that due process simply requires that "when a jury instruction sets forth all the elements of the charged crime but incorrectly adds one more element, a sufficiency challenge should be assessed against the elements of the charged crime, not against the erroneously heightened command in the jury instruction." Id. at 715.

In Tyler, we recognized that because Washington courts apply the federal constitutional standard for evidentiary sufficiency review, decisions of the United States Supreme Court are the controlling authority on the proper application of that standard. Thus, on the standard to be applied to a challenge to the

---

[1] In her reply brief, Colson argues that possession of stolen mail is an alternative means statute by analogizing it to the theft statute. We will not consider arguments raised for the first time on reply. Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

sufficiency of the evidence, Musacchio supersedes all inconsistent interpretations by the courts of this state. Northern Pac. Ry. Co. v. Longmire, 104 Wash. 121, 125, 176 P. 150 (1918). Accordingly, here, as in Tyler, we disregard "additional elements" and "false alternative means" in a to-convict instruction and instead, assess the sufficiency of the evidence against the elements of the charged crime. Tyler, 195 Wn. App. at 400 (citing Musacchio, 136 S. Ct. at 715).[2]

Because possession of stolen mail is a single-means crime, we evaluate the sufficiency of the evidence against the essential elements of the charged crime: possession of at least ten separate pieces of stolen mail addressed to at least three different mailboxes. RCW 9A.56.380(1). The State met this burden by presenting evidence that at least ten pieces of stolen mail, addressed to three different addresses were found in Colson's car on February 16, 2012.

Major Economic Offense

Colson argues that the "major economic offense" aggravators for the Nordstrom scheme counts should be stricken from the judgment and sentence due to a flaw in the jury verdict forms. The State argues that this issue is moot because the trial court did not actually impose an exceptional sentence based on those aggravators.

The trial court can impose an exceptional sentence based on aggravating circumstances considered by the jury. One aggravating factor is if the current

---

[2] In a statement of additional authority, Colson cites to a recent decision from Division Three of this court. In State v. Jussila, No. 32684-5-III (Wash. Ct. App. Feb. 28, 2017), a divided court declined to follow Musacchio, concluding that Hickman remained the binding authority in this state. For the reasons set forth in Tyler, we respectfully disagree.

No. 73798-8-I/11

offense was a major economic offense or series of offenses. RCW

9.94A.535(3)(d). The jury was instructed that,

> To find that a crime is a major economic offense, at least one of the following factors must be proved beyond a reasonable doubt:
> (1) The crime involved multiple victims or multiple incidents per victim; or
> (2) The crime involved attempted or actual monetary loss substantially greater than typical for the crime; or
> (3) The crime involved a high degree of sophistication or planning or occurred over a lengthy period of time.

CP at 141.

"As a general rule, we do not consider questions that are moot." State v. Hunley, 175 Wn.2d 901, 907, 287 P.3d 584 (2012) (citing State v. Gentry, 125 Wn.2d 570, 616, 888 P.2d 1105 (1995)). "A case is technically moot if the court can no longer provide effective relief." Id. An appeal of an expired sentence is moot because the court can no longer offer effective relief. Id. at 901; In re Cross, 99 Wn.2d 373, 376-77, 662 P.2d 828 (1983). However, a court will review an appeal if the sentence has collateral effects. State v. Rinaldo, 98 Wn.2d 419, 422, 655 P.2d 1141, (1982) (appeal of designation as sexual psychopath was not moot because the designation affected defendant's parole status and eligibility for early release, and "the stigma associated with the classification is of no small consequence") (citing United States, ex rel Stachulak v. Coughlin, 520 F.2d 931 (7th Cir. 1975); State v. Vike, 125 Wn.2d 407, 409 n.2, 885 P.2d 824 (1994) (appeal of a sentencing matter was not moot even though defendant already served his sentence due to impact on how future convictions would be scored for future sentencing).

11

Colson argues that even though she did not receive an exceptional sentence, the major economic offense aggravator could have a collateral impact. She proposes that the aggravator is stigmatizing, and a hypothetical registration system for perpetrators of major economic offenses would be detrimental. Colson's registration system for financial crimes is an imagined collateral consequence. And the stigma of a major economic offense aggravator is no greater than Colson's convictions for identity theft, and is of much smaller consequence than that of the "sexual psychopath" in Rinaldo. Just as the expiration of a sentence renders an issue moot, the non-existence of an exceptional sentence renders this issue moot.

Even if this issue were ripe for review, the record supports that Nordstrom scheme counts are major economic offenses. "[F]or aggravating factors that are phrased in relation to 'the current offense' to apply to an accomplice, the jury must find that the defendant had some knowledge that informs that factor." State v. Hayes, 182 Wn.2d 556, 566, 342 P.3d 1144 (2015). The "major economic offense" aggravator can be sustained only for the offenses that Colson committed as a principal, or those for which the jury found that she had knowledge of the major economic offense. There is sufficient evidence of an aggravator if, viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the essential elements beyond a reasonable doubt. State v. Hyder, 159 Wn. App. 234, 258, 244 P.3d 454 (2011).

Here, viewing the evidence in the light most favorable to the State, testimony by Chopra supports that Colson was involved in at least one aspect of

12

each Nordstrom count. That evidence is sufficient for a rational juror to conclude that Colson was either a principal or had knowledge of the multiple crimes involved in the Nordstrom scheme. This is sufficient to sustain the major economic offense findings.

Attorney Fees

Colson also asks that no costs be awarded on appeal. The State asks that it be awarded its costs. Appellate costs are generally awarded to the substantially prevailing party. RAP 14.2. However, when a trial court makes a finding of indigency, that finding remains throughout review "unless the commissioner or clerk determines by a preponderance of the evidence that the offender's financial circumstances have significantly improved since the last determination of indigency." Id.

Here, the trial court's determination as to Colson's indigency status is not in the record. But the record does show that Colson declared herself indigent and that she was permitted to appeal in forma pauperis. If a finding of indigency was made and the State has evidence indicating that Colson's financial circumstances have significantly improved since the trial court's finding, it may file a motion for costs with the commissioner. If no such determination exists, then the State may seek an award of costs and the commissioner shall decide in the first instance whether Colson has "the current or likely future ability to pay such costs." RAP 14.2.

Because none of the claimed errors has merit, Colson's appeal is denied.

Affirmed.

WE CONCUR: